IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHARLES D. ANDERSON,

  Plaintiff,

Vs.                                           No.  06-4125-SAC

UNION PACIFIC RAILROAD
COMPANY,

  Defendant.

MEMORANDUM AND ORDER

This case comes before the court on defendant's motion for summary judgment. Plaintiff, whose employment with defendant was terminated, alleges that defendant discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 et seq. Plaintiff also brings a Kansas common law claim for breach of an implied contract of employment.

**Summary Judgment Standard**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir.1998). The moving party must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. He  may not rely upon mere allegations or denials contained in its pleadings or briefs, and "must come forward with 'specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)). The opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986).

## Facts

Plaintiff was first hired by Union Pacific in 1967. On his employment application, plaintiff acknowledged he was applying for employment "on the terms and conditions set forth" in his application, which contained the following statements:

> .. Nothing in this application contained shall be construed as a contract to employ….
> .. Term of employment: It is understood that the term of my employment is indefinite; that it will continue only so long as mutually agreeable to both parties, and that it may be terminated by either party at any time, with or without cause.
> .. Cause for Discharge: I agree that the violation of any of the foregoing conditions, or the misstatement of any fact in my application for employment, or the violation of any of the company's rules, orders or instructions, shall constitute sufficient cause for my immediate discharge from the service of the company, but the enumeration of these grounds for discharge shall not be deemed to exclude others, or in any way to modify the provisions of Item 1 hereof.

(Ex. B, Pretrial Order.)

After plaintiff's initial hiring, Union Pacific developed a separate at-will employment policy, unknown to plaintiff, which provides:

> Employment with Union Pacific is voluntary and "at will." Nothing contained in the HR Policy Manual, express or implied, is intended to create a contract or assurance of continued employment. Just as the employee is free to leave the employ of the Company at any time and for any reason, the Company

has the right to terminate employment any time, with or without notice, for any reason or no reason.

Dk. 60, Ex. D.

In October 1997, Union Pacific promoted Plaintiff to the position of Manager of Track Maintenance ("MTM").  As MTM, Plaintiff was responsible for overseeing track maintenance operations for the railroad from Topeka to Brookfield and Quinter, Kansas. Plaintiff supervised approximately 30 employees on the Salina track maintenance group, including Rob Mermis and Larry Huddleston.

The track maintenance group is responsible for general maintenance of the railroad, including lubricating "switches," which are used to divert trains between railroad tracks. Switch lube is applied to each section of the track on a rotating basis, and after complaints that a switch is not working properly.

As MTM, Plaintiff was responsible for purchasing supplies and materials for his track maintenance group. During the relevant time period, materials and supplies could be procured through an internal procurement process and supply department by (1) checking the supply catalogue on the mainframe system, (2) calling the supply department to order products, and (3) using Union Pacific's web-based e-procurement system.

4

Additionally, designated employees with purchasing responsibilities were provided Company VISA credit cards to make emergency purchases and purchases of items not available directly from the Union Pacific supply department.

Plaintiff understood that anything that was regularly used by the track maintenance team could and should be purchased through the Union Pacific supply department. Prior to July 2004, switch lube was not available through the Union Pacific supply department. Beginning in July 2004, switch lube was available through the Union Pacific supply department.

Union Pacific issued plaintiff a Company VISA credit card in 1994. With his VISA card, plaintiff received a copy of the "UPPR Procedure for the Procurement of Materials not exceeding $500" ("the VISA Procedure"), which contains guidelines for use of the card.  As set forth in the VISA Procedure:

> .. Purchases could not be broken into smaller purchases (parceling) in order to meet a VISA card's transaction limit; and
> .. The VISA card was not to be used to purchase stock material, such as track material.

Dk. 60, Ex. G. Nonetheless, parceling was done by the Salina track maintenance group. To ensure compliance with Union Pacific policy and procedure, a VISA cardholder's approving manager was responsible for

5

reviewing and approving all transactions. When Plaintiff received his Union Pacific VISA card, he acknowledged that unauthorized use of the card may result in immediate disciplinary action up to and including termination of his employment with Union Pacific.

Pursuant to Union Pacific General Responsibilities 1.26, "[e]mployees must not accept gifts or rewards from customers, suppliers, or contractors of the railroad unless authorized by the proper authority." Dk. 60, Exh. H. Plaintiff understood that Union Pacific prohibited employees from accepting gifts from customers if the gift would affect or give the appearance of affecting the employee's judgment. Other employees have accepted dinner from Union Pacific suppliers and may have accepted football tickets from suppliers, without discipline.

In 2004, a Union Pacific employee reported his receipt of unsolicited switch lube and an invoice from a Florida company to Union Pacific's police force, which is comprised of federal law enforcement agents. Ken Schleiger, an officer in the Union Pacific Police Department, investigated the questionable transactions with the Florida company.  During the course of his investigation, Schleiger discovered that 220 Union Pacific employees had used Company VISA cards to purchase switch lube and/or other

6

products from the Florida company.  Schleiger discovered that the switch

lube available through the Florida company was frequently more expensive

than the switch lube available through the internal Union Pacific supply

department.  Schleiger also discovered that the Florida company sent

gratuities (*e.g*, personal merchandise, cash cards for retailers) to Union

Pacific employees, based on the amount of product purchased.

Union Pacific then conducted an audit of all purchases on Union

Pacific VISA cards from the Florida company. After conducting some initial

interviews and detecting a pattern, Union Pacific decided to interview the

103 employees whose individual total purchases exceeded $2,000, based

on its belief that purchases under $2,000 were likely not significant enough

to gain gratuities. The interviews were divided between two teams, one of

which was Schleiger and Dan McLaughlin, of Corporate Audit.

Union Pacific considered the Florida company highly unethical in its

methods for inducing Union Pacific employees to purchase products, but

also expected its employees to not engage in activities which violated its

rules of ethics and conduct. Union Pacific has an ethics committee which is

responsible for making sure Union Pacific policies and practices are

ethically sound and for determining corrective action and discipline in

7

response to ethics violations.

In 2004, Union Pacific established an ethics subcommittee to review the interview summaries, evaluate employee involvement, and determine discipline in conjunction with the VISA Fraud Investigation. The ethics subcommittee was comprised of Dennis Jacobson, Bob Grimaila, and Butch Ethington. Because of the scope of the VISA Fraud Investigation and the individual interviews conducted by the interview teams, the members of the ethics subcommittee did not personally speak with any of the employees investigated.

The ethics subcommittee developed a matrix for evaluating misconduct and assessing discipline based on the VISA Fraud Investigation. That matrix provided for numerical scores of 0 to 10 as to each of 10 factors for which the investigation team interview summaries provided information. A total score was then tabulated for each individual. Although not perfect, Union Pacific considered the matrix to be the best method for fairly assessing the relative severity of the misconduct by each of the individuals.

The ethics subcommittee was ultimately responsible for scoring all employees investigated according to the same matrix. Based on the scores

received on the matrix, the level of discipline assessed varied from warnings to termination of employment. As a result of the VISA investigation, Union Pacific terminated the employment of twenty individuals who scored 61 or higher on the matrix, including plaintiff, who scored 79. Employees who scored below 61 on the matrix received lesser or no discipline. Pretrial Order, Stip. 33. Union Pacific assessed discipline short of termination to 43 employees who were older than Plaintiff.

Of the 220 employees implicated in the VISA Fraud Investigation, 204 were over the age of 40 as of December 31, 2004. Of the 20 employees terminated as a result of the VISA Fraud Investigation, 19 were over the age of 40. Most employees in the track maintenance organization who have purchasing authority and responsibilities are senior employees who are typically over the age of 40.

The Salina track maintenance group purchased switch lube from the Florida company. Although plaintiff was responsible for purchasing for his group, Mermis assisted him in purchasing materials and supplies. Plaintiff authorized Mermis to purchase switch lube from the Florida company. Because all the purchases made from the Florida company for plaintiff's team were on Mermis' card, Schleiger and McLaughlin first interviewed

9

Mermis about his involvement with the Florida company. The investigation subsequently turned to plaintiff, and Plaintiff was interviewed by Messrs. Schleiger and McLaughlin. Messrs. McLaughlin and Schleiger spent approximately one day interviewing Messrs. Anderson, Mermis, and others.

From approximately March 2002 to July 2004, Plaintiff authorized Mermis to make approximately 24 purchases of switch lube totaling approximately $20,000 from the Florida company. When Mr. Mermis submitted expense reports for the purchases of switch lube,plaintiff approved and signed off on the expense reports, thus those purchases were not approved by plaintiff's boss. When purchases exceeded Mermis' credit card transaction or monthly limits or plaintiff's monthly budget, plaintiff instructed Mermis to parcel out the charges in smaller transactions below the limits.  After reviewing documentation of plaintiff's and Mermis' purchases, the price of switch lube available through the Union Pacific store, and the quantity of product received, Schleiger and McLaughlin determined that the Florida company charged $8,100 more than they would have paid for the graphite or switch lube from the Union Pacific store.

During the VISA investigation, plaintiff admitted that he instructed Mermis to purchase products from the Florida company, that the prices

10

paid for the products by the Florida company were higher than the price for the switch lube available at the Union Pacific store, that he instructed Mermis to parcel the orders into smaller transactions, and that the Florida company sent him baseball hats, a jacket, and two GPS units as gratuities for purchasing products. Plaintiff notes, however, that switch lube was not available from the Union Pacific store prior to 2004, that switch lube from the Florida company was cheaper when first ordered than the graphite lube available from the company supply department, that the ease of application of the Florida switch lube was better than the company switch lube available after 2004, that his employees preferred switch lube to graphite lube, that parceling was common practice, that plaintiff never used the baseball hats or jacket or GPS units for his personal use, and that he sought and received permission to use the GPS units in company cars and the company retained them.

Based on the number and dollar level of purchases made at plaintiff's direction, and information learned during the investigation as to the level and type of gratuities received by others who ordered similar levels of product from the Florida company, Schleiger and McLaughlin believed that plaintiff likely received other gratuities such as cash cards,

11

and that plaintiff was likely not being entirely honest with them in denying

his receipt of other gratuities.

The ethics committee scored plaintiff "79" on the matrix for his

involvement in the VISA fraud scheme, based on its review of McLaughlin's

summary of his interview with plaintiff. This assessment was based on the

following underlying scores:

> a. Violated company VISA policy by purchasing store-stock items
> from outside vendor: 10;
> b. Dollar volume of purchases from unapproved vendor(s): 8;
> c. Transaction volume of purchases from unapproved vendor(s): 9;
> d. Dates the policy-violating purchases commenced and ended (if
> so),
> and the duration of activity: 10;
> e. Degree of cooperation with the auditor and police investigators: 7;
> f. Evidence or admission of authorizing payment for product(s) not
> received: 0;
> g. Evidence and/or admission of knowledge that prices paid were
> inflated compared to store stock: 10;
> h. Evidence and/or admission of accepting gratuities or kickbacks:
> 10;
> i. Investigators opinion(s), if expressed: 5;
> j. All other considerations, including intangibles, in reviewers
> opinion: 10.

Pretrial order, Stip. 44.

On January 11, 2005, Union Pacific terminated plaintiff's

employment for the stated reason of plaintiff's violation of company

policies, including those related to purchasing and corporate ethics,

12

associated with his use of the VISA card. Prior to his termination, plaintiff had worked for Union Pacific for 35 years, had been complimented by his superiors, had received numerous promotions, had never been cited for misconduct, insubordination, or misuse of company property, and had never received an unsatisfactory review. Larry Huddleston, a 49 year old subordinate of plaintiff's who had worked at the railroad for 24 years, replaced plaintiff as MTM.

At the time of plaintiff's termination, plaintiff was 55 years old, Ethington was 57 years old, Jacobson was 55 years old, and Grimaila was 47 years old. Plaintiff has never meet Jacobson or Ethington, but had attended meetings with Grimaila, whom he did not know personally. The ethics subcommittee did not discuss the ages of the individuals investigated, or their length of service. Prior to this lawsuit, Messrs. Ethington, Jacobson, and Grimaila did not know Mr. Anderson's age, or that he was in the age-protected class.

Plaintiff does not recall hearing any discriminatory age-related comments during his employment. Plaintiff understood that Union Pacific had a complaint procedure for making complaints under the EEO policy and maintained a 1-800 number for such complaints. Plaintiff did not make

any complaint of discrimination during his employment by Union Pacific.

## Age Discrimination Claims

Age discrimination claims under the KAAD are evaluated using the same criteria as ADEA claims. *See Veale v. Sprint Corp.*, 1997 Westlaw 49114, at *5 n. 2 (D.Kan. Feb. 3, 1997) (citing *Kansas State Univ. v. Kansas Comm'n on Civil Rights*, 14 Kan.App.2d 428, 796 P.2d 1046 (1990)). Accordingly, the court will address the age discrimination claims concurrently, while referring to the ADEA for convenience.

The ADEA makes it illegal for an employer to "discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). Thus, a plaintiff suing under the ADEA must prove that the challenged employment action was motivated, at least in part, by his age. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000). The plaintiff may carry this burden either by presenting direct evidence of the employer's discriminatory intent or by presenting circumstantial evidence creating an inference of a discriminatory motive using the tripartite *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *see Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1165 (10th Cir.2000). In the present case, no direct evidence of

14

discriminatory intent is shown, thus plaintiff proceeds on the basis of circumstantial evidence.

The applicable analysis first allocates the burden of production to the employee to establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the employee is successful in doing so, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action causes the presumption of discrimination attendant to the prima facie showing of discrimination "to simply drop[ ] out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The employee then has the full burden to show that the employer discriminated on the basis of age. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005). "The [employee] may do so by ... showing that the proffered reason is a pretext for illegal discrimination...." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir.1994), *abrogated on other grounds by Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir.2003). *Timmerman v. U.S. Bank, N.A.,*483 F.3d 1106, 1113 (10th Cir.2007).

**Prima Facie Case**

To establish a prima facie case, the plaintiff has the burden to show four elements.

> Under the McDonnell Douglas burden-shifting framework, the plaintiff must first establish a prima facie case by showing that (1) he belonged to a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) the position was not eliminated after his discharge. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir.2000). If the plaintiff cannot show that his position was not eliminated, the plaintiff may provide other evidence that the termination occurred under circumstances that give rise to an inference of unlawful discrimination. *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir.2005). In this Circuit "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios." *Id.* at 1100.

*Hare v. Denver Merchandise Mart, Inc.*, 2007 WL 3230907, *4 (10th Cir.2007).

Here, both parties concede that the four elements of a prima facie case are met. Defendant concedes that plaintiff's position was not eliminated after his discharge and that plaintiff, then 55, was replaced by a younger person, age 49. Nonetheless, defendant contends that plaintiff cannot establish a prima facie case because he fails to show that the decision makers were aware that plaintiff was over age 40.

The Tenth Circuit has recognized that implicit in the formulation of a prima facie case is "that the person responsible for the termination must be aware that the plaintiff belonged to a protected class. *Geraci v.*

16

*Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir.1996)." *Belcher v. Boeing Commercial Airplane Group,*105 Fed.Appx. 222, 226, 2004 WL 1472812, *3 10th Cir.2004) (analyzing prima facie case of racial discrimination based on termination). Some knowledge is required to support the inference necessary to establish a prima facie case. "The inference of discrimination does not make sense when the decision maker is unaware of the employee's membership in a protected class." *Id.*

The parties agree that "the ethics committee made the decision to terminate [plaintiff's] employment." Dk. 60, p. 15, No. 67. No evidence has been submitted, however, to show how many persons served on the ethics committee, who they were, where they worked, or what knowledge or lack thereof they had of plaintiff, his age, or his position. Confusingly, the record cited in support of the undisputed fact that the ethics committee was the decision maker shows that the ethics *subcommittee* made the decision to terminate plaintiff's employment. The court thus examines the record relative to the subcommittee's knowledge of plaintiff's age.

Affidavits from the three individuals who served on the ethics sub-committee each state the affiant "was not aware of the ages or years of service of any of the individuals investigated," and prior to the lawsuit "was

17

not aware of [plaintiff's] age or years of service." Dk. 60, Exh. P,Q, & R. It is additionally uncontested that prior to this lawsuit, the subcommittee members were not aware that plaintiff was in the age-protected class. Ethington and Jacobson had never met plaintiff, although Grimaila attended meetings with him.

Plaintiff counters with subcommittee member Jacobson's affidavit, which admits, "In general, most employees in the track maintenance organization who have purchasing authority and responsibilities are senior employees who are typically over the age of 40." Dk.60, Exh. P. The members of the subcommittee knew that plaintiff was in the track maintenance organization and had purchasing authority, since that was the genesis for their investigation.  Their investigation revealed that plaintiff had authorized purchases by Mermis. The court agrees that by virtue of the subcommittee members' general knowledge of the position plaintiff held and the specific purchasing authority he had exercised, it is reasonable to infer that they also believed plaintiff was over 40. Accordingly, plaintiff has sufficiently shown for purposes of summary judgment that the decision makers were aware of plaintiff's membership in a protected class.

Accordingly, the burden shifts to defendant to show a

nondiscriminatory reason for plaintiff's termination. This burden is not onerous. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.1999) (recognizing employer's burden is "exceedingly light"). In response to plaintiff's prima facie case, the defendant successfully articulates that plaintiff was terminated, along with numerous other employees, for violation of company policies, including those related to purchasing and corporate ethics, associated with his use of the VISA card.

### Pretext

Thus it becomes plaintiff's burden to present evidence either that the employer's stated reason is a pretext or that the termination decision was motivated by age discrimination. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir.2002). Plaintiff attempts to meet this burden solely by showing pretext.

> An employee may show pretext based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief. *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).

*Timmerman v. U.S. Bank, N.A. ,* 483 F.3d 1106, 1113 (10th Cir.2007). A plaintiff need not show, in addition to evidence that the defendants' proffered reasons for discharging him were pretextual, evidence that age

discrimination was the real reason. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-49 (2000); *Randle v. City of Aurora,* 69 F.3d 441 (10[th]Cir.1995) (stating that discriminatory animus may be inferred from the simple showing of pretext.); *Hare v. Denver Merchandise Mart, Inc.* 2007 WL 3230907, *7 -8 (10th Cir.2007).

No "disturbing procedural irregularities" surrounding plaintiff's termination are present. Compare *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services*,165 F.3d 1321,1329 (10th Cir. 1999). No actions or remarks are alleged to have been made by decisionmakers that could be viewed as reflecting a discriminatory animus. No preferential treatment is alleged to have been given to employees outside the protected class.

Instead, plaintiff attempts to show pretext in large part by reliance upon statistics. Plaintiff points out that nineteen of the twenty employees terminated as a result of the VISA fraud investigation (*i.e.*, 95%) were over the age of 40.  Defendant counters that 93% of the employees who used VISA cards to purchase from the suspect vendor were over the age of 40, thus the adverse actions corresponded with employee behavior, not employee age. Plaintiff also notes that fourteen of the sixteen replacements

20

were younger than their predecessors. To this, defendant replies that

thirteen of the sixteen replacements were over the age of 40.    The

statistics offered by plaintiff are not helpful because they do not compare

employees that are similarly situated. Plaintiff fails to show that any

employee outside the protected class, or younger than himself, was not

terminated despite a comparable violation of the purchasing policies or

similar score on the relevant matrix. Nor do the statistics show a

disproportionate effect on older workers.

> When we say that statistical evidence must compare employees that
> are "similarly situated," we ordinarily mean that the situation of the
> employees in the protected class must have been comparable to the
> situation of the employees in the non-protected class who were
> allegedly treated more favorably. *See Cone*, 14 F.3d at 532-33.
> Nonetheless, we think it a matter of common sense that the probative
> value of statistical evidence will also vary depending upon the degree
> of difference between the situations of the protected employees
> within the statistical data set and the employee seeking to utilize that
> data. The fact that a plaintiff is required to demonstrate pretext does
> not grant a jury license to second-guess all prior hiring, firing and
> disciplinary decisions no matter how attenuated they might be from
> the challenged action. *Cf. Simms v. Okla. ex rel. Dep't of Mental
> Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th
> Cir.1999). ("Our role is to prevent unlawful hiring practices, not to act
> as a 'super personnel department' that second guesses employers'
> business judgments.").

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 (10th Cir.2007).

Plaintiff also contends that the evidence of his misconduct was so

weak and his history of performance with the company so strong that a rational factfinder could infer that the expressed reason for terminating him must have been pretextual. *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007).

Having reviewed the record, the court agrees that plaintiff had a long and positive history with the company, that his employee record is unblemished by disciplinary measures or other black marks prior to the VISA investigation, that he appears to have enjoyed a reputation for honesty, and that any violation by plaintiff of company policies associated with his use of the VISA card may have been borne of ignorance, inadvertence, or trust in his subordinates, rather than of any intent to personally profit. Nonetheless, the record reflects that defendant reasonably investigated the matter and impartially evaluated the seriousness of plaintiff's violation, that defendants reasonably believed that plaintiff violated company policies, and that plaintiff suffered the same adverse action as did younger employees whose violations were deemed to be similarly serious, whether outside the protected age group[1] or within

---

[1]*See* Dk. 68, Exh. U, Exh. A and B, showing two employees under age 40 who received 76 points were terminated for VISA policy violations.

it.[2] Additionally, plaintiff does not dispute that the two persons who interviewed him during the investigation sincerely believed that plaintiff was not likely being entirely honest with them concerning his receipt of gratuities and thought that plaintiff had likely received other gratuities such as cash cards. (Pretrial order stip. 43.)

A pretext argument requires the court to "examine the facts as they appear to the person making the decision," to determine whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir.2004) (internal quotations omitted). The court does not review the wisdom or fairness of the employer's proffered reasons. *Id.* The ADEA does not prohibit an employer from making a hasty or harsh decision that is non-discriminatory. *See E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1321 (10th Cir.1992).

The court concludes that  plaintiff has failed to show "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendant's] proffered legitimate reasons for its action such that a

---

[2]*See* Dk. 68, Exh. U, Exh. A and B, showing six employees in their 40's were terminated for VISA policy violations, having received the following points: 61, 61, 71, 76, 80, and 84.

reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). Even if plaintiff was entirely honest with his interviewers and they erred in believing he was being deceitful, no pretext is shown, as plaintiff's subjective intentions have no bearing on the question of pretext. *Cf. Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir.1996). "What matters is whether [defendant] could have reasonably believed that company policy had been violated. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) ("The test is good faith belief.")." *Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106, 1119 (10th Cir.2007). Accordingly, summary judgment in defendant's favor is warranted on plaintiff's claims of age discrimination.

**Implied employment contract**

Defendant also seeks summary judgment on plaintiff's claim that he had an implied agreement with defendant that plaintiff would not be terminated absent good cause.

Under Kansas law, employment is terminable at the will of either party absent an express or implied contract of a specific duration or recognized public policy concerns. *Burnett v. Southwestern Bell Telephone, L.P.*, 283 Kan. 134 (2007), quoting *Hysten v. Burlington*

24

*Northern Santa Fe Ry. Co.,* 277 Kan. 551, 554 (2004). A contract of

employment will be implied, however, if facts and circumstances show

mutual intent to contract. *See Kastner v. Blue Cross & Blue Shield of Kan.,*

*Inc.*, 21 Kan.App.2d 16, 23 (1995) (citing *Allegri v. Providence-St. Margaret*

*Health Ctr.*, 9 Kan.App.2d 659, 663 (1984)). Relevant factors in

determining intent include (1) the understanding and intent of the parties;

(2) the conduct of the parties; (3) the usages of the business; (4) the

situation and objective of the parties giving rise to the relationship; (5) the

nature of employment; and (6) any other circumstances surrounding the

employment relationship which would tend to make clear the intention of

the parties at the time the employment relationship commenced. *See*

*Morriss v. Coleman Co.*, 241 Kan. 501, 513 (1987). A plaintiff's unilateral

expectations of continued employment are insufficient. *See Panis v.*

*Mission Hills Bank*, N.A., 60 F.3d 1486, 1492 (10th Cir.1995).

To meet his burden to show intent to contract, plaintiff first points to

language in his initial employment application signed in 1967. This

application contains a paragraph captioned "Cause for Discharge," stating:

> I agree that the violation of an of the foregoing conditions , or
> the misstatement of any fact in my application for employment, or the
> violation of any of the company's rules, orders or instructions, shall
> constitute sufficient cause for my immediate discharge from the

service of the company; but the enumeration of these grounds for discharge shall not be deemed to exclude others, or in any way to modify the provisions of Item 1 hereof.[3]

Dk. 60, Exh. C, p. 7.

Defendant counters that the same application earlier contains a clear at-will provision, captioned "Term of employment," stating:

It is understood that the term of my employment is indefinite; that it will continue only so long as mutually agreeable to both parties, and that it may be terminated by either party at any time, with or without cause.

Dk. 60, Exh. C, p. 5.

To this plaintiff suggests that the two provisions above create an ambiguity which should be construed against defendant, as drafter of the document. The court does not agree that the two provisions are inconsistent or otherwise create an ambiguity. The "Cause for Discharge" paragraph merely states that cause is sufficient for discharge. Nothing in its language reasonably implies that cause is necessary for discharge.  The at-will paragraph is consistent in stating the cause is sufficient, although not necessary for termination. Neither provision is reasonably susceptible to more than one meaning or creates uncertainty as to its meaning, whether

---

[3]Item 1 of the terms and conditions of employment on the application relates to collective bargaining agreements. Dk. 60, Exh. C, p. 5.

26

the provisions are read separately or together. Plaintiff adds that he never saw a separate at-will policy statement in defendant's policy manual, Dk. 60, Exh. D, but this does not negate the fact that plaintiff signed the employment application which contained a clear and unambiguous statement of at-will employment.

Plaintiff next asserts that the guidelines for business conduct created by defendant in 1999 confirm the existence of an implied contract. Defendant asserts the document merely identifies various categories of business conduct violations and lists corresponding typical sanctions. Plaintiff asserts this document establishes a progressive disciplinary policy which restricts the "typical sanction" of termination to violations more severe than plaintiff's.  Defendant shows the court that these guidelines were created by the ethics committee and were not distributed outside the ethics subcommittee. Dk. 68, Exh. R. Plaintiff does not pretend to have seen this document during his employment and cannot have relied upon it as is necessary to show mutual intent to contract. Therefore, the mere existence of the document is not helpful to show an implied contract. Because plaintiff's employment application, the guidelines for business conduct, and other evidence of record fail to raise a question of material

fact regarding an implied contract, summary judgment is warranted in

defendant's favor on this claim.

IT IS THEREFORE ORDERED that defendant's motion for summary

judgment (Dk. 59) is granted.

Dated this 7th day of January, 2008, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge